**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **VIRGINIA MCGANN,** | ) | |
| **on behalf of herself and all others similarly** | ) | |
| **situated** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 11-cv-06894** |
| | ) | |
| **PNC BANK, NATIONAL ASSOCIATION,** | ) | **Judge Joan H. Lefkow** |
| **Successor by merger to National City** | ) | |
| **Mortgage Co.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Virginia McGann ("McGann"), brings this putative class action against

Defendant, PNC Bank, National Association, successor by merger to National City Mortgage

Co. ("PNC"), alleging breach of contract (count I), breach of the duty of good faith and fair

dealing (count II)[1], promissory estoppel (count III), and violation of the Illinois Consumer Fraud

and Deceptive Business Practices Act 815 ILL. COMP. STAT. 505 *et seq.* (count IV).[2]  McGann

sues on behalf of herself and thousands of similarly situated, distressed Illinois homeowners

alleging that PNC failed to honor its written agreements to modify mortgage loans and prevent

foreclosures under the federal government's Home Affordable Modification Plan.  Presently

---

[1] By agreement of the parties, McGann voluntarily dismissed count II.  *See* Dkt. 44 at 26 ¶ 131.

[2] This court has jurisdiction under 28 U.S.C. § 1332 and venue is appropriate under 28 U.S.C. § 1391(b).

before the court is PNC's motion for judgment on the pleadings.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings after a complaint and answer have been filed. Fed. R. Civ. P. 12(c); *Buchanan-Moore* v. *Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). Similar to a Rule 12(b)(6) motion, a court deciding a Rule 12(c) motion must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth* v. *Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). A court will grant a defendant's motion for judgment on the pleadings "only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Guise* v. *BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004) (internal quotation marks omitted). In deciding a motion for judgment on the pleadings, "the court considers the pleadings alone, which consist of the complaint, the answer, and any written instruments attached as exhibits." *Housing Auth. Risk Retention Grp., Inc.* v. *Chicago Housing Auth.*, 378 F.3d 596, 600 (7th Cir. 2004). When making this determination, the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *N. Ind. Gun & Outdoor Shows, Inc.* v. *City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

## BACKGROUND[3]

### I.     The HAMP Program

On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 *et seq.*, which Congress amended on February 17, 2009, with the passage of American Recovery and Reinvestment Act (collectively referred to as "the Act"). Part of the Act's purpose was to protect home values and preserve homeownership.  Pursuant to the Act, on February 18, 2009, the Secretary of the Treasury and Director of the Federal Housing Finance Authority announced the Making Home Affordable Program ("MHAP").  Part of MHAP included the creation and implementation of a loan modification process called the Home Affordable Modification Plan ("HAMP").

The HAMP loan modification process consists of two stages.  First, a servicer[4] gathers financial information from the homeowner interested in a loan modification.  The servicer then offers the homeowner a Trial Period Plan, which is a three-month trial period where the homeowner makes reduced monthly mortgage payments determined by a formula incorporating the data from the financial information provided by the homeowner.  The Trial Period Plan Agreement ("TPP Agreement") describes the homeowner's duties and obligations in order to be considered for a permanent loan modification.  Second, if the homeowner complies with the TPP Agreement, the servicer then offers the homeowner a permanent loan modification.

---

[3] The facts in the background section are taken from the complaint, answer, and exhibits attached thereto and are taken as true for purposes of this motion.

[4] Servicers are those entities in the mortgage industry that perform the actual interface with borrowers and act as agent of the entities that hold the mortgage loans.  Servicers perform functions such as payment acceptance and processing, collections, credit reporting, escrow account maintenance, loss mitigation and foreclosure.

On September 23, 2010, PNC executed an Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("SPA") with Fannie Mae acting as agent of the United States Department of the Treasury. In connection with the SPA, PNC received $58,300,000 in incentive payments in exchange for modifying mortgage obligations of eligible homeowners to prevent and reduce foreclosures.

## II.     Plaintiff Virginia McGann

McGann is a homeowner who owns and resides at the property located at 11306 South Bell Avenue in Chicago, Illinois ("the property") with her two children. On or about October 11, 2004, National City Mortgage Company ("National City") gave McGann and Earl Evans, McGann's then-husband, a refinance mortgage loan for the property. In connection with the closing of the loan, Evans received a promissory note, a mortgage, a HUD-1 Settlement Statement, and a final Truth-in-Lending Disclosure Statement. Evans and McGann signed the mortgage; however, only Evans signed the promissory note. In December 2008, PNC acquired National City and PNC is the current owner and servicer of McGann's loan.

On June 24, 2008, the Circuit Court of Cook County entered a judgment for dissolution of the marriage of McGann and Evans. The divorce decree provided that McGann would retain exclusive possession of the property until either (1) their youngest child graduated from high school; or (2) McGann sold or refinanced the mortgage at which time McGann would pay Evans $20,000 for his interest in the property. The divorce decree also provided that McGann would assume all obligations for the payment of the mortgage, including paying real estate taxes, insurance, and all other expenses relating to the property. McGann further agreed to indemnify

4

Evans for any payments in connection with his financial obligations for the property.[5]

### III.    The TPP Agreement

Starting in May 2009, McGann was temporarily unemployed for several months and she began having difficulty making mortgage payments on the property.  Before missing a payment, in August 2009, McGann contacted PNC for assistance with restructuring her monthly mortgage payments.  On or about September 14, 2009, McGann submitted her first application for a loan modification through the HAMP program.  On October 15, 2009, PNC responded to McGann's HAMP request via letter addressed to Evans offering a Home Affordable Modification Trial Period Plan.  The TPP Agreement identified Evans as the borrower.  The TPP Agreement reduced McGann's monthly mortgage payments to $1,266.85 (inclusive of principal, interest, taxes, and insurance) for a ninety-day period.

The TPP Agreement conditioned a permanent loan modification on the borrower's remaining in compliance with the terms of the TPP Agreement and certifying that he or she lived at the property and that there had been no change with regard to the ownership of the property after execution of the loan documents.  The TPP Agreement further provided that it would not take effect until both parties signed the document:

> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me the written notice that I do not qualify for the Offer.  This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

---

[5]  The court may take judicial notice of the divorce decree without converting PNC's motion for judgment on the pleadings into a motion for summary judgment. *See Ennenga* v. *Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Taking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment.").

(Dkt. 42-3 Ex. G at 1.)  PNC never executed the TPP Agreement.[6]

## IV.   McGann's Correspondence and Communication with PNC Regarding the HAMP Loan Modification

On November 1, 2009, McGann returned two copies of the signed TPP Agreement to PNC.  McGann crossed out Evans's name in the signature block and signed her name.  McGann made the first three payments under the TPP Agreement of $1,266.85 in November and December, 2009 and January, 2010.  On March 22, 2010, PNC sent Evans a letter at the property that McGann received[7] discussing the need for "additional or missing documents" and stating that PNC needed those documents within 15 days or the file would be closed.

On April 1, 2010, McGann spoke with a PNC employee named Kathy Rawlins who explained that McGann needed to submit further documentation regarding her unemployment benefits from the State of Illinois.  Rawlins told McGann that she was not in danger of being removed from her trial period plan because she called before the deadline identified in the March 22, 2010 letter.  On April 13, 2010, PNC sent Evans a letter at the property that McGann

---

[6]  The TPP Agreement did not constitute a loan modification.  Rather, the TPP Agreement identified necessary conditions before a modification could occur, stating that,

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify or if I fail to meet any one of the requirements under this Plan.

(Dkt. 42-3 Ex. G at 3 ¶ 2.G.)

[7]  PNC addressed all correspondence to Evans at the property.  McGann received the correspondence as she lived at the property.  The record does not indicate whether McGann informed the PNC employees with whom she spoke that, although she and Evans had divorced, McGann continued to live at the property, was making the monthly mortgage payments, and was seeking a loan modification under HAMP.

received stating that it could not approve the HAMP loan modification because PNC had not received the required documents. Additionally, McGann spoke with a PNC employee who informed her that her file had been deleted from the MHAP. On April 19, 2010, a PNC employee informed McGann that her loan had been switched to PNC's collections department and McGann requested that her loan be reinstated into the MHAP. On or about April 20, 2010, McGann faxed PNC the requested employment and HAMP application documents.

On or about April 22, 2010, PNC sent Evans a letter at the property that McGann received stating that PNC needed a "Financial Information Summary." McGann faxed this paperwork the next day. On or around May 6, 2010, McGann called Rawlins to make a payment under the TPP Agreement and inquire about the status of her reinstatement to MHAP. Rawlins informed McGann that her file was still under review and to refrain from making any further TPP Agreement payments until she was reinstated in the MHAP program. McGann still continued to make and PNC accepted TPP Agreement payments through the summer of 2010.

On May 7, 2010, McGann received a call from PNC requesting documents that McGann had already submitted and she faxed the requested documents the same day. On or about May 26, 2010, McGann spoke with an employee at PNC who informed her that she was reinstated in MHAP and that she needed to re-submit her 2009 tax returns, which she did. On June 15, 2010, PNC sent Evans a letter at the property that McGann received, similar to the March 15, 2010 letter, again requesting 2009 tax returns. Although she had already submitted her 2009 tax returns, on June 21, 2010, McGann faxed those documents to PNC. On June 30, 2010, McGann spoke with a PNC employee, Lisa Cole, who told her to continue making TPP Agreement payments and to wait to hear from PNC.

On July 1, 2010, PNC sent Evans a letter at the property that McGann received denying eligibility for a HAMP loan modification due to an incomplete credit application. The letter further provided that "a notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago." (Am. Compl. ¶ 64) (internal quotation marks omitted). McGann, however, never received the notice referenced in PNC's July 1, 2010 letter. On July 7, 2010, McGann called PNC and spoke with Cole, who stated that she saw no reason why McGann's file had a "failed" status. Cole apologized to McGann and reset her loan application to be approved under MHAP. On July 28, 2010, PNC sent Evans a letter that McGann received at the property stating that PNC had denied the HAMP loan modification because the property was not owner occupied. On July 30, 2010, McGann called PNC explaining that the system would no longer let her make payments under the TPP Agreement. The employee with whom McGann spoke replied, "I know, I get this all the time." (Am. Compl. ¶ 82) (internal quotation marks omitted). In total, McGann made eight payments under the TPP Agreement.

On August 3, 2010, PNC sent Evans a letter at the property that McGann received providing that the loan was in default as no monthly installment payment had been paid since January 2010. The letter stated that a payment of $18,639.64 was needed to cure the breach. On August 13, 2010, PNC sent Evans a letter at the property that McGann received stating that PNC had not received all the requisite documentation to become eligible for a HAMP modification. On August 16, 2010, PNC sent a letter to McGann that included directions regarding how to apply to HAMP.

On August 20, 2010, McGann sent PNC documents regarding her financial information

8

and hardships, and on September 18, 2010, PNC approved McGann for a four-month

forbearance agreement. McGann made all of the forbearance payments on time. On September

30, 2010, after speaking with a PNC employee, McGann submitted another HAMP application.

On February 7, 2011, PNC responded to McGann's HAMP application and informed her that she

needed to submit updated pay stubs, bank information, and her 2010 tax returns. On February

15, 2011, PNC sent Evans a letter at the property that McGann received stating that the loan had

been referred to foreclosure. On or about February 24, 2011, a PNC employee approved

McGann for a second forbearance agreement. The second forbearance agreement was

contingent on McGann's submitting all required documents no later than February 28, 2011.

The second forbearance agreement called for four payments, the first of which was due on

March 15, 2011 and the last of which was due on June 15, 2011. McGann made two of the four

payments in full and on time. Still, on March 3, 2011, PNC filed a complaint to foreclose the

mortgage on the property.

**ANALYSIS**

**I.      Breach of Contract (Count I)**

        McGann claims that PNC is liable for breach of contract because the TPP Agreement

contained an offer for a HAMP loan modification, which she accepted by executing the TPP and

returning it to PNC with the requested documentation. McGann claims that PNC breached the

TPP Agreement by not offering her a permanent HAMP loan modification. PNC contends that it

did not breach the TPP Agreement because its plain terms provide that it had no obligation to

provide a permanent HAMP loan modification until it executed and returned the TPP Agreement

to McGann. McGann argues that even if PNC never intended to be bound by the TPP

Agreement, her returning the TPP Agreement to PNC constituted an offer that PNC accepted by accepting her modified mortgage payments.

### A.     Whether PNC Intended to be Bound by the TPP Agreement

Under Illinois law,[8] a plaintiff alleging breach of contract must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages."  *Reger Dev., LLC* v. *Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal quotation marks omitted).  In construing a contract, a court's role "is to give effect to the parties' intent as expressed in the terms of their written agreement."  *Lewitton* v. *ITA Software, Inc.*, 585 F.3d 377, 379 (7th Cir. 2009).  Neither party contends that the contract is ambiguous, so the "four corners rule" applies.  *See Home Ins. Co.* v. *Chicago & Nw. Trans. Co.*, 56 F.3d 763, 767 (7th Cir. 1995).  "This so called four-corners rule holds that if a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over–no evidence outside of the contract may be considered."  *Id.*

In *Wigod* v. *Wells Fargo Bank*, *N.A.*, 673 F.3d 547 (7th Cir. 2012), the Seventh Circuit addressed whether a TPP Agreement binds the lender to provide a HAMP loan modification when the borrower complies with the terms contained therein.  After determining that the plaintiff was eligible for a HAMP loan modification, the defendant sent the plaintiff a TPP Agreement, which she signed and returned.  *Id.* at 558.  The defendant executed a copy of the

---

[8]  Pursuant to the doctrine espoused by the Supreme Court in *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938), the court applies Illinois substantive law when determining whether the parties have a valid contract.  *See Gacek* v. *Am. Airlines, Inc.*, 614 F.3d 298, 301–02 (7th Cir. 2010) ("Under the *Erie* doctrine, federal courts in diversity cases (and any other cases in which state law supplies the rule of decision) apply state 'substantive' law but federal 'procedural' law.").

TPP Agreement and returned it to the plaintiff who then made all scheduled payments. *Id*. The defendant, however, never approved the plaintiff for a permanent HAMP loan modification. *Id*. The plaintiff filed suit alleging, *inter alia*, that the defendant was liable for breach of contract by not offering her a permanent HAMP loan modification pursuant to the terms of the TPP Agreement. *Id*. at 559. The Seventh Circuit held that once the defendant executed the TPP Agreement, "its terms included a unilateral offer to modify [the plaintiff's] loan conditioned on her compliance with the stated terms of the bargain." *Id*. at 562. If the plaintiff satisfied her obligations under the TPP Agreement, the defendant "had on obligation to *offer* [the plaintiff] a permanent modification[.]" *Id*. at 563 (emphasis in original). The plaintiff alleged that she satisfied her obligations but the defendant still did not offer her a permanent modification. *Id*. at 565. The Seventh Circuit reversed, holding that the plaintiff had sufficiently pleaded a breach of contract claim against the defendant for failing to comply with the TPP Agreement. *Id*. at 565–66.

Here, the plain language of the TPP Agreement states PNC is not obligated to provide a HAMP loan modification until both parties execute the TPP Agreement, stating that,

> This Plan will not take effect unless and until both I and the Lender sign it and [the] Lender provides me with a copy of this Plan with the Lender's signature.

(Dkt. 42-3, at 1.) Unlike *Wigod*, PNC never executed and returned the TPP Agreement to McGann and instead it requested additional documentation from McGann. Pursuant to the TPP Agreement's own terms, PNC's failure to sign the agreement evidences that it had no obligation to offer McGann a HAMP loan modification. *See*, *e.g.*, *Pennington* v. *HSBC Bank USA, N.A.*, 493 F. App'x 548, 554 (5th Cir. 2012) (The parties' TPP Agreement did not form a binding contract as it required that the lender execute the TPP Agreement and the lender's failure to

execute the TPP Agreement evidenced that it "never expressed an intent to be bound."); *Avevedo* v. *CitiMortgage, Inc.*, No. 11 C 4877, 2012 WL 3134222, at *8 (N.D. Ill. July 25, 2012) ("The court agrees with [the defendant] that the fact it did not execute the TPP associated with the plaintiffs' loan and return that document to them is fatal to the plaintiffs' breach of contract claim."); *see also Wigod*, 673 F.3d at 563 ("Once [the defendant] signed the TPP Agreement and returned it to [the plaintiff], an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if [the plaintiff] fulfilled its conditions."); *but see Sutcliffe* v. *Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 550 (N.D. Cal. 2012) ("The Court finds more persuasive the reasoning in the line of cases that has found, at least at the pleading stage, that the TPP offers a sufficient basis to show the existence of an enforceable agreement."). Because PNC never executed and returned the document, it had no obligation to offer McGann a permanent HAMP loan modification pursuant to the TPP Agreement.[9]

### B. Whether McGann's Payments to PNC under the TPP Constituted a Counter-Offer

McGann additionally argues that executing and returning the TPP Agreement to PNC constituted an offer, which PNC accepted by accepting her reduced mortgage payments and financial documents. Under Illinois law, "[a] purported acceptance that contains different or additional terms is not a valid acceptance, but is treated as a counter-offer." *Dawson* v. *Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992). "Where one accepts an offer conditionally or introduces a new term into the acceptance, no acceptance occurs, rather it becomes in effect a counterproposal which must be accepted by the offeror before a valid contract is formed."

---

[9] PNC first raised the argument that it did not execute the TPP Agreement in its reply brief. The court gave McGann an opportunity to file a sur-reply on this issue; however, she failed to comply with the filing date proscribed by the court.

*Arthur Rubloff & Co.* v. *Drovers Nat'l Bank of Chicago*, 400 N.E.2d 614, 618, 80 Ill. App. 3d 867, 36 Ill. Dec. 194 (Ill. App. Ct. 1980).

Even if it is assumed that McGann's signing and returning the TPP constituted a counteroffer, McGann cannot show that PNC accepted that counteroffer. PNC continued to accept McGann's reduced mortgage payments after the TPP period ended but McGann still owed PNC monthly payments pursuant to the note. *See Pennington*, 493 F. App'x at 555 ("Although the [defendant's] acceptance of the trial payments from the [plaintiffs] lends some support to finding that the parties intended to be bound, that weight is reduced, because the [plaintiffs] already owed regular payments."). Although PNC continued to request and accept McGann's financial documentation, merely requesting and accepting those documents did not evidence an intent to be bound by the terms of the TPP Agreement. McGann's signing and returning the TPP to PNC thus did not create a contractual relationship obligating PNC to offer her a HAMP home loan modification. Therefore, PNC's motion for judgment on the pleadings is granted as to count I.

## II.    Promissory Estoppel (Count III)

McGann also claims that PNC is liable under a theory of promissory estoppel for promising to offer her a HAMP loan modification. PNC contends that it never made such a promise and that McGann cannot show that she reasonably relied on any representation. Promissory estoppel is an alternative means by which to obtain contractual relief. *Wigod*, 673 F.3d at 566. Under Illinois law, to establish a promissory estoppel claim, McGann must show that (1) PNC made an unambiguous promise to her; (2) she relied on that promise; (3) her reliance was reasonable and foreseeable by PNC; and (4) she relied on PNC's promise to her

detriment. *Wigod*, 673 F.3d at 566 (citing *Newton Tractor Sales, Inc.* v. *Kubota Tractor Corp.*, 906 N.E.2d 520, 523–24, 233 Ill. 2d 46, 329 Ill. Dec. 322 (Ill. 2009)).

PNC argues that it never promised McGann that it would offer her a permanent loan modification upon which she could have reasonably relied.[10]  The language of the TPP Agreement specifically provided that it did not constitute a loan modification.  The TPP Agreement conditioned approval of a loan modification on PNC's determination that McGann complied with requisite conditions.  McGann, however, alleges that in addition to providing the TPP Agreement, PNC's employees told her that she was being considered for a HAMP loan modification.  McGann alleges that PNC's employees told her that she was not in danger of being removed from her TPP Agreement (Am. Compl. ¶ 62), that her HAMP application was still under review and although no decision had yet been made as PNC had all the information it needed (*id.* ¶ 71), that she had been reinstated in MHAP and all she needed to do was resubmit her 2009 tax returns (*id.* ¶ 73), to continue making payments under the TPP Agreement and wait to hear from PNC (*id.* ¶ 77).  McGann's communications with PNC's employees after receiving the TPP Agreement lend credence to her belief that continuing to comply with PNC's dictates

---

[10]  PNC argues that McGann never qualified for a HAMP loan modification because she was not the borrower for the property.  Whether McGann was qualified for a permanent loan modification is a defense that raises factual questions that are not amenable to disposition at the present time.  *See Wigod*, 673 F.3d at 579 ("One [] defense, among others, will be that [the plaintiff] was not actually qualified, but that presents a factual dispute that cannot be resolved now.").  In addition, PNC argues that McGann failed to comply with the TPP Agreement's terms because Evans was the borrower for the property and he did not reside at the property nor did he sign the TPP Agreement.  McGann contends that she reasonably relied on promises other than those contained solely in the TPP Agreement.  McGann alleges that she was in frequent communication with PNC's employees who told her to continue submitting documentation.  McGann's telephone calls with PNC's employees demonstrate that PNC knew that it was dealing with McGann and PNC's employees made representations about the prospect of the home loan modification in those calls to McGann.  McGann thus did not solely rely on the representations contained in the TPP Agreement.

would result in PNC's considering her for a permanent loan modification. *See, e.g.*, *Fletcher* v. *OneWest Bank, FSB*, 798 F. Supp. 2d 925, 932–33 (N.D. Ill. 2011) ("[The plaintiff] is claiming reliance on [the defendant's] promise to consider her application and give her a response."). McGann's conversations with PNC, which took place over the course of one year, thus form the basis of the unambiguous promise that PNC would consider her for a HAMP loan modification.

McGann also alleges that she relied on PNC's assurance that she was being considered for a HAMP loan modification to her detriment because she continued to make payments under the TPP Agreement. The TPP Agreement required that McGann make three reduced monthly mortgage payments; however, McGann made eight of the reduced payments in total based on PNC's employees telling her to do so. Before entering into the TPP Agreement, McGann was already obligated to make monthly mortgage payments to PNC. *See Prentice* v. *UDC Advisory Servs., Inc.*, 648 N.E.2d 146, 152, 271 Ill. App. 3d 505, 207 Ill. Dec. 690 (Ill. App. Ct. 1995) ("Promissory estoppel cannot be based upon a promise which only induces plaintiffs to do that which they were already legally bound to do."). Still, McGann continued to make those payments in lieu of other options, such as bankruptcy, refinancing her home, or a short sale, because she believed that doing so would make her eligible for a loan modification. *See Wigod*, 673 F.3d at 566 ("A lost opportunity can constitute a sufficient detriment to support a promissory estoppel claim."). As a result of making those payments, McGann defaulted on her mortgage obligations, which resulted in PNC's ultimately instituting foreclosure proceedings. McGann has thus sufficiently alleged the she detrimentally relied on PNC's representations concerning a HAMP loan modification.

PNC also notes that the statute of frauds precludes McGann from recovering on her

15

promissory estoppel claim because she has no signed writing from PNC evidencing that it agreed to offer her a HAMP loan modification. The statute of frauds is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), which PNC did not raise in its answer to McGann's amended complaint. *See Brunswick Leasing Corp.* v. *Wis. Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998) ("As a general matter, an affirmative defense that is not timely pleaded is waived."). Nevertheless for the sake of completeness, the court will consider the effect of the statute of frauds on McGann's promissory estoppel claim. The Illinois statute of frauds requires a writing signed by the party to be charged for contracts conveying an interest in land. *See* 740 ILL. COMP. STAT. 80/2; *John O. Schofield* v. *Nikkel*, 731 N.E. 2d 915, 925, 314 Ill. App. 3d 771, 247 Ill. Dec. 142 (Ill. App. Ct. 2005); *see also Robinson* v. *BDO Seidman, LLP*, 854 N.E. 2d 767, 773, 367 Ill. App. 3d 366, 305 Ill. Dec. 175 (Ill. App. Ct. 2006) (the statute of frauds is applicable to promissory estoppel claims). An exception to the statute of fraud occurs when a party partially performs, which can bar invoking the statute of frauds where it would "be impossible or impractical to place the parties in status quo or restore or compensate the performing party for the value of his performance." *McInerney* v. *Charter Golf, Inc.*, 680 N.E.2d 1347, 1352, 176 Ill. 2d 482, 223 Ill. Dec. 911 (Ill. 1997) (internal quotation marks omitted). McGann's case falls squarely within the part performance exception to the statute of frauds. For over one year, McGann abided by PNC's employees' requests for documentation and made eight TPP payments with the expectation that she would become eligible for a home loan modification. Although no writing exists embodying this promise, McGann's part performance precludes application of the statute of frauds. Accordingly, PNC's motion for judgment on the pleadings is denied with respect to count III.

### III.    Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV)

McGann alleges that the PNC is liable for damages under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") for engaging in a deceptive or unfair practice by misrepresenting that it would offer McGann a HAMP loan modification.  PNC contends that McGann cannot maintain her ICFA claim because it never had an obligation to offer her a permanent home loan modification under HAMP.

The ICFA "'is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.'"  *Siegel* v. *Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson* v. *Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960, 201 Ill. 2d 403, 266 Ill. Dec. 879 (Ill. 2002)).  Under the ICFA, a plaintiff can maintain a claim that is premised on either deceptive or unfair practices.  *See Robinson*, 775 N.E.2d at 960.  The parties dispute whether PNC engaged in a deceptive practice or unfair act in connection with McGann's request for a HAMP loan modification.

#### A.    Deceptive Practice

McGann first alleges that PNC engaged in a deceptive practice by misrepresenting that it would approve her for a permanent home loan modification if she continued to make TPP payments and submitted further documentation.  McGann alleges that PNC defrauded customers with the false promise of a HAMP loan modification and made negligent or intentional representations that constituted fraud in the inducement.  *See* Am. Compl. ¶ 2, 140.  Because McGann alleges fraudulent activity, the heightened pleading standard of Rule 9(b) applies.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr.* v. *Walgreen Co.*, 631 F.3d 436, 446–47

17

(7th Cir. 2011).  To satisfy Rule 9(b)'s pleading threshold, the pleader must detail "the identity

of the person who made the misrepresentation, the time, place and content of the

misrepresentation, and the method by which the misrepresentation was communicated to the

plaintiff."  *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir.

1997) (internal quotation marks omitted); *Vicom, Inc.* v. *Harbridge Merchant Servs.*, *Inc.*, 20

F.3d 771, 777 (7th Cir. 1994).

Under the ICFA, "a statement is deceptive if it creates a likelihood of deception or has

the

capacity to deceive."  *Bober* v. *Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001).  An

IFCA claim does not require "proof of intent to deceive"; rather, a plaintiff only needs to allege

"that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that

act."  *Wigod*, 673 F.3d at 575.  To show a deceptive practice under the ICFA, McGann must

demonstrate "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the

plaintiff rely on the deception; and (3) the deception occurred in the course of trade or

commerce; and (4) the consumer fraud proximately caused the plaintiff's injury."  *Rickher* v.

*Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (internal quotation marks omitted).

According to the amended complaint, McGann spoke with PNC representatives for close

to one year who advised her to continue making TPP payments and to send documentation that

PNC needed in connection with considering her loan modification request.  McGann details

specific instances where PNC employees discussed the prospect of her loan modification and

when those conversations occurred.  McGann submitted the requested documentation but PNC

continued to identify deficiencies with her request.  Although PNC addressed its correspondence

18

to Evans, at no time did PNC or its employees raise issues regarding McGann's borrower status or the requirement that Evans reside at the property. McGann alleges that she had numerous conversations beforehand with PNC employees who were aware that McGann was seeking the loan modification, making the mortgage payments, and resided at the property. At the direction of PNC's employees, McGann also made eight total payments under the TPP Agreement even though it only called for three payments, which, as noted, ultimately led to her default on the mortgage. These allegations provide the requisite specificity to show that PNC engaged in a deceptive practice by misrepresenting whether it would approve McGann's HAMP loan modification.[11]

### B. Unfair Practice

McGann also alleges that PNC committed an unfair practice under ICFA.[12] To show that PNC's practice was "unfair" under the ICFA, "the practice must offend public policy; be immoral, unethical, oppressive, or unscrupulous; or cause substantial injury to consumers." *See Rickher*, 535 F.3d at 665 (internal quotation marks omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to

---

[11] PNC also argues that it never promised anything to McGann because it addressed correspondence to Evans, and that McGann was not qualified for the loan modification because she was not the borrower for the property. McGann's allegations that she spoke with PNC employees about a loan modification for the property belie these arguments. While PNC addressed correspondence to Evans instead of McGann, the telephone calls support McGann's position that PNC knew that it was dealing with her, not Evans, and PNC's employees made representations about McGann's prospect of a loan modification, not those of Evans.

[12] McGann's allegations regarding unfair practices do not implicate fraud and thus need not meet Rule 9(b)'s heightened pleading requirement. *See Windy City Metal Fabricators & Supply* v. *CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b).").

which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E. 2d at 961 (internal quotation marks omitted).

In support of her position, McGann points to her year-long endeavor to obtain a home loan modification and abide by PNC's directions. McGann argues that the during this process, PNC failed to adhere to HAMP's guidelines. *See Boyd* v. *U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 753 (N.D. Ill. 2011) ("[A] plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations, like HAMP . . . that themselves do not allow for private enforcement."). The Treasury Department's directive implementing HAMP provided in part,

> A servicer may receive calls from current or delinquent borrowers directly inquiring about the availability of the HAMP. In that case, the servicer should work with the borrower to obtain the borrower's financial and hardship information and to determine if the HAMP is appropriate. If the servicer concludes a current borrower is in danger of imminent default, the servicer *must* consider an HAMP modification . . . Servicers *must* use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion.

*Boyd*, 787 F. Supp. 2d at 753 (emphasis in original) (quoting U.S. Dep't of Treasury, HAMP Supplemental Directive No. 09–01, at 14 (Apr. 6, 2009)).

Here, McGann's allegations belie that PNC worked with her to determine if she qualified for a HAMP loan modification. That PNC accepted payments under the TPP Agreement from McGann, informed her that it needed documents that she already submitted, and ultimately abruptly denied her request multiple times shortly after reassuring her application was still under review evidence a lack of communication indicative of unfair practices. Indeed, PNC brought foreclosure proceedings against McGann while she was still trying to obtain a HAMP loan modification. McGann has thus sufficiently alleged a violation of the ICFA. Accordingly, PNC's motion for judgment on the pleadings as to count IV is denied.

**CONCLUSION**

PNC's motion for judgment on the pleadings is granted with respect to count I and denied with respect to counts III and IV.

Dated:  March 29, 2013                     Enter:

_____

JOAN HUMPHREY LEFKOW
United States District Judge