# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| VIRGINIA MCGANN, individually and on behalf all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 11 C 6894 |
| ) | Judge Joan H. Lefkow |
| PNC BANK, NATIONAL ASSOCIATION, ) successor by merger to National City ) Mortgage Co., ) ) | |
| Defendant. ) ) | |

## OPINION AND ORDER

Plaintiff Virginia McGann filed this putative class action against PNC Bank complaining that the bank's treatment of applicants for loan modifications under the Home Affordable Modification Program ("HAMP") violated federal, state, and common law. (Dkt. 1.) After a series of amendments, a motion for judgment on the pleadings, and a partial voluntary dismissal, plaintiff's complaint was reduced to two counts: an allegation that PNC Bank is liable under promissory estoppel and an allegation that PNC Bank violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* ("Illinois Consumer Fraud Act" or "ICFA"). Before the court is defendant's motion for summary judgment on both counts. (Dkt. 182.) For the reasons stated below, defendant's motion is granted.[1]

---

[1] The court has jurisdiction under 28 U.S.C. § 1332(a). Venue is appropriate in this district under 28 U.S.C. § 1391(b).

**BACKGROUND**[2]

**I.     HAMP Program**

The U.S. Department of the Treasury implemented HAMP as part of its emergency

measures "to help homeowners avoid foreclosure amidst the sharp decline in the nation's

housing market in 2008." *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 554 (7th Cir. 2012).

In connection with this program, the Secretary of the Treasury "negotiated Servicer Participation

Agreements (SPAs) with dozens of home loan servicers." *Id.* at 556. The servicers agreed to

identify homeowners who were in default or who were likely to be in default on their mortgage

payments and to modify their loans if they qualified for the program. *Id.* Qualification followed

a three-step process:  (1) the servicer would determine whether the borrower met certain

threshold requirements for modification under HAMP (*e.g.*, the loan had to have originated

before January 1, 2009); (2) the servicer would calculate a modification using a "waterfall"

method imposed by Treasury Department regulations; and (3) the servicer would apply a Net

Present Value test "to assess whether the modified mortgage's value to the servicer would be

greater than the return on the mortgage if unmodified." *Id.* at 556–57. If the value of the

modified mortgage was lower than the servicer's expected return after foreclosure, then the

servicer was not required to offer a modification. *Id.* at 557. If, however, the value of the

modified loan exceeded the projected return after a foreclosure, then the servicer had to offer a

modification. *Id.*

---

[2] The court will address many but not all of the factual allegations in the parties' submissions, as
the court is "not bound to discuss in detail every single factual allegation put forth at the summary
judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation
omitted). In accordance with its regular practice, the court has considered the parties' objections to
statements of fact and included in this background only those parts of the statements and responses that
are appropriately supported and relevant to the resolution of this motion.

As the program functions now, the servicer first determines whether the borrower is eligible and, if so, implements a three-month Trial Period Plan ("TPP") under the new loan repayment terms. *Id.* If the borrower complies with the terms of the TPP, then the servicer offers a permanent modification. *Id.* Under the original guidelines, however, a servicer could initiate a TPP based on a borrower's undocumented representations. *Id.* at 557, n.2. (noting that the original guidelines, which were in effect until 2010, allowed servicers to rely on "verbal financial information to prepare and offer a Trial Period Plan" and that servicers were "not required to verify financial information prior to the effective date of the trial period" (internal quotation marks omitted)). This was done so the Department of the Treasury could roll out the program as quickly as possible.

## II. McGann's Attempts to Secure a Loan Modification

In October 2004, McGann's husband, Earl Evans, took out a loan for $272,200 from National City Mortgage Company.[3] (Dkt. 184 ("Def. L.R. 56.1") ¶ 8.) McGann did not join him as a co-borrower because her credit was poor. (*Id.* ¶ 12.) Her name, therefore, is not on the promissory note. (*See id.* at ¶¶ 8, 12.) That same day, Evans and McGann signed a mortgage granting their interest in their home as security for repayment of the loan.[4] (*Id.* ¶ 11.)

Four years later, McGann and Evans divorced. In June 2008, they agreed to the following divorce judgment:

> The current mortgage is in EARL's name alone.
>
> . . . it is not possible for VIRGINIA to refinance the mortgage and remove EARL's name therefrom. As such, EARL shall direct the

---

[3] National City Mortgage Company later merged with PNC. (Def. L.R. 56.1 ¶ 3.)

[4] As defendant explains, McGann's signature on the mortgage simply granted her ownership interest in the property and did not make her a borrower. (*See* dkt. 183 at 7–8.)

> bank to add VIRGINIA's name to said account so she may have
> access to same and receive monthly statements in order to pay
> same when due.
>
> VIRGINIA shall retain exclusive possession, right, and interest in
> the marital residence . . . .
>
> VIRGINIA shall assume all obligations for the payment of the
> mortgage. . . [and] shall indemnify, save and hold EARL harmless
> with reference to such payments.

(*Id.* ¶ 13 (alterations in original).)  At this point, only McGann and her children lived in the home; Evans had moved out.  (*Id.* ¶ 16.)

McGann soon had trouble making the mortgage payments.  (*Id.* ¶ 19.)  In early 2009, Evans filed a petition with the divorce court, claiming McGann had been late on all payments since the divorce judgment was entered.[5]  (*Id.* ¶¶ 19–20.)  Around that same time, McGann called PNC Bank and requested the bank allow her to assume Evans's obligations under the mortgage.  (*Id.* ¶ 22.)  PNC Bank denied her request, informing McGann that her credit score was too low.  (*Id.*)  In August 2009, over a year after the divorce judgment was entered, McGann called PNC to request assistance in applying for a loan modification under HAMP.  (*Id.* ¶ 23.)

McGann's attempts to secure a modification under HAMP were problematic from the beginning.  After McGann asked PNC Bank for assistance in applying to the program, the bank sent an application package to Evans at his new address, as he was the only borrower listed on the loan.  (*Id.*)  Evans gave the package to McGann after her attorney sent him a letter demanding he turn it over.  (*Id.* ¶ 24.)

In September 2009, a month after first requesting the application, McGann submitted it to PNC Bank.  (*Id.* ¶ 25.)  On the application, under the "reason for seeking modification" McGann checked the box marked "co-borrower," listed herself as the co-borrower, and signed on the co-

_____

[5] McGann claims she was current on the payments as of September 2009.  (Pl. L.R. 56.1 Resp. ¶ 19.)

borrower signature line. (*Id.*) McGann added an asterisk, however, stating "not actual co-borrower" and referred to an enclosed copy of the divorce judgment. (Dkt. 207 ("Pl. L.R. 56.1 Resp.") ¶ 25.) On an affidavit of financial hardship, which she submitted with the application, she listed herself as a co-borrower without an asterisk. (*Id.*; *see also* dkt. 184-5 at 59.) In October 2009, still operating under the original guidelines, PNC Bank sent a TPP agreement to Evans, who then forwarded it to McGann. (*Id.* ¶ 26.) McGann's name did not appear anywhere on the agreement; it was addressed to Evans and listed his name on the signature line. (*Id.* ¶ 27.) McGann crossed out Evans's name on the signature line and signed her own. (*Id.* ¶ 29.) McGann claims PNC told her to do this; PNC maintains it did not. (Pl. L.R. 56.1 Resp. ¶ 13); (Def. L.R. 56.1 ¶ 29.)

Thus began a lengthy back and forth between McGann and PNC Bank. Under the original guidelines, an individual was only eligible for a HAMP modification if she was a borrower (or had assumed the mortgage loan) and if she occupied the property at issue. (Def. L.R. 56.1 ¶ 37.) Evans was a borrower but did not occupy the property; McGann occupied the property but was not a borrower and had not assumed the loan. Under these circumstances, the loan did not qualify for a HAMP modification. McGann claims, however, that this fact was not timely communicated to her. (Pl. L.R. 56.1 ¶¶ 18–21.) Instead, she spent months submitting and resubmitting documents to PNC Bank, often because the instructions she was given over the phone contradicted the instructions she received in the mail. (*Id.* ¶¶ 18–19.) McGann claims that her application was repeatedly "closed, re-opened, and then reinstated" and that at one point, she had never been approved in the first place. (*Id.* ¶¶ 20–21.) During this time, McGann continued to make monthly payments of $1,267, the same amount she had made under the TPP. (*Id.* ¶ 17.) McGann further alleges PNC told her to continue making the payments. (*Id.*)

McGann maintains that although she understood her status as a non-borrower could be a problem as early as February 2010, "at no time" did she understand she would not be approved as a result. (Dkt. 184-5 at 63:7–64:14.) In July 2010, nine months after McGann first submitted the application, PNC Bank sent a letter to McGann's home, addressed to Evans, denying the HAMP modification because the home was not occupied by a borrower. (Def. L.R. 56.1 ¶ 38.) Even after this letter, however, McGann claims she did not understand that she was ineligible for a loan modification under HAMP. (*See* dkt. 184-5 at 63:7–23.)

After she received the letter denying the HAMP modification, McGann met with a PNC employee. (Pl. L.R. 56.1 ¶ 24.) The employee told McGann that the fact that the loan was in Evans's name "might be against her," agreed to put the loan in forbearance for four months, and told her to submit another HAMP application. (Def. L.R. 56.1 ¶¶ 39–41.) The forbearance payments were in the same amount as the initial TPP payments. (Pl. L.R. 56.1 ¶ 27.) McGann made all four payments. (*Id.* ¶ 27.) In January 2011, however, PNC sent McGann a notice of default and intent to file foreclosure absent reinstatement. (Dkt. 207-1 at 270.) In late February 2011, McGann met with another PNC Bank employee who gave her an additional four-month forbearance. (Def. L.R. 56.1 ¶ 43.) The forbearance payments were also in the same amount as the initial TPP payments. (Pl. L.R. 56.1 ¶ 32.) The agreement, however, stated that the payments would not lead to reinstatement. (*Id.* ¶ 33.) On March 3, 2011 PNC Bank filed a complaint for foreclosure. (Def. L.R. 56.1 ¶ 45.)

III.    **Procedural History**

In September 2011, McGann filed her law suit alleging breach of contract, breach of the duty of good faith and fair dealing and, in the alternative, asking for relief under the doctrine of promissory estoppel. (Dkt. 1.) The complaint also alleged a violation of the Illinois Consumer

Fraud Act. (*Id.*) McGann amended her complaint in May of the following year, voluntarily

dismissing her allegation of breach of the duty of good faith and fair dealing. (Dkt. 42.) PNC

Bank moved for judgment on the pleadings shortly after. (Dkt. 56.) The court granted PNC

Bank's motion with respect to McGann's breach of contract claim only. (Dkt. 98.) McGann

then amended her complaint a second time, adding a count under the Fair Housing Act, 42

U.S.C. § 3605 *et seq.*, and a count under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et*

*seq.* She later voluntarily dismissed both. (Dkts. 105, 120.)

On December 23, 2014, PNC Bank moved for summary judgment on the only two

remaining claims: McGann's request for promissory estoppel and her allegation that PNC Bank

violated the ICFA. (Dkt. 182.)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242,

248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether a genuine issue of fact

exists, the court must pierce the pleadings and assess the proof as presented in depositions,

answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P.

56(c).

The party seeking summary judgment bears the initial burden of proving there is no

genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548,

91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone

but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at

324.  If a claim or defense is devoid of any factual support, the court may dispose of it.  *Id.* at

323–24.

Summary judgment "does not denigrate the role of the jury."  *Anderson*, 477 U.S. at 255.

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge . . . .  [Thus, the] evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.*; *see also*

*Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

## ANALYSIS

### I.      Promissory Estoppel

Promissory estoppel is an alternative means of obtaining what is essentially contractual

relief under Illinois law.  *Wigod*, 673 F.3d at 566.  It makes a promise binding where "all the

other elements of a contract exist, but consideration is lacking."  *Dumas* v. *Infinity Broadcasting*

*Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (citing *Bank of Marion* v. *Robert "Chick" Fritz, Inc.*,

311 N.E.2d 138, 140, 57 Ill. 2d 120 (1974)).  To establish the elements of promissory estoppel, a

plaintiff must show that (1) the defendant made an unambiguous promise to the plaintiff, (2) the

plaintiff reasonably relied on that promise, (3) the plaintiff's reliance was foreseeable by

defendant, and (4) the plaintiff relied on the promise to her detriment.  *Newton Tractor Sales,*

*Inc.* v. *Kubota Tractor Corp.*, 906 N.E.2d 520, 523–24, 233 Ill. 2d 46, 329 Ill. Dec. 322 (2009).

McGann alleges that PNC Bank "made representations . . . that[] if she returned the TPP

agreement, executed and with supporting documents, and made the TPP payments, she would

receive a permanent HAMP modification."  (Dkt. 105 ("Sec. Am. Compl.") ¶ 143.)  She explains

that PNC Bank made these representations "by way of the TPP Agreement."  (*Id.*)  She also

alleges that she relied on the promise to her detriment.  (*Id.* ¶ 144–47.)  Defendant raises

8

numerous arguments as to why plaintiff's promissory estoppel claim cannot survive summary judgment. The claim can be resolved for failure of proof of one: plaintiff cannot point to any facts in support of her allegation that defendant made an unambiguous promise that if she signed and returned the TPP agreement and made the TPP payments, she would receive a permanent HAMP modification.

As the court observed in its opinion granting in part and denying in part defendant's motion for judgment on the pleadings, the TPP agreement specifically stated that it did not constitute a loan modification and that a loan modification was contingent on PNC Bank's determination that McGann met the requisite conditions. (*Id.*) McGann was allowed to go forward on the basis that an unambiguous promise could be based on her testimony that PNC employees repeatedly told her that all she had to do to receive a permanent modification was to continue making TPP payments and resubmit documents.

After discovery, however, McGann cannot point to an unambiguous promise made by PNC Bank or its employees that if she signed and returned the TPP agreement and made the TPP payments, she would receive a permanent HAMP modification. Instead, McGann testified that PNC Bank employees repeatedly told her either that her application was being reviewed or that it had been rejected but would be reinstated. (Dkt. 184-5 at 110–11, 213–15.) A promise to review or even to reinstate an application is not a promise that the application will result in a permanent loan modification. The bank employees only told McGann that they were considering her application; they did not tell her that the loan modification was forthcoming. Indeed, McGann still had to meet HAMP's requirements. That was clear from the TPP agreement itself.

Nor does McGann's testimony that she was told her application was up for "re-approval" constitute evidence of an unambiguous promise. (*Id.* at 213–15.) When discussing the

9

conversation during her deposition where she alleges a PNC Bank employee told her that her application was up for "re-approval", McGann testified that she took the word "to mean that this was a mistake," that her application was "supposed to have been approved before" and now it was supposed to be "re-approved." (*Id*. at 215:6–8.) But she acknowledged that the employee told her that it had to be reviewed again. (*Id.* at 217:17–19.) Even drawing every reasonable inference in McGann's favor, the most this conversation could mean is that the application was up for review and that it *might* be approved. No reasonable jury could find that it constitutes an unambiguous promise that if she signed and returned the TPP agreement and made the TPP payments, she would receive a permanent HAMP modification.

McGann's final argument is that PNC Bank's continued acceptance of TPP payments after the three-month period (in other words, payments in the same amount as those under the TPP agreement that went toward the mortgage loan) was an unambiguous promise. (*See* Pl. L.R. 56.1 ¶ 17.) Although Illinois law does not require that a promise be express to be considered unambiguous, *see Bank Computer Network Corp.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 442 N.E.2d 586, 590–91, 110 Ill. App. 3d 492, 66 Ill. Dec. 160 (1982), it is hard to see how the acceptance of payments is unambiguous—especially when the TPP agreement under which McGann claims she made those payments explicitly stated that it did not constitute a loan modification. *See Marquez* v. *Wells Fargo Bank, N.A.*, No. CIV.A. 12-11725, 2013 WL 98533, at *3 (D. Mass. Jan. 8, 2013) (finding that bank's acceptance of plaintiffs' TPP payments was not an unambiguous promise: "The only unambiguous promise here . . . was the assurance that a modification would issue 'once [Wells Fargo was] able to confirm [plaintiffs'] income and eligibility for the program.'" (alterations in original)).

10

Even if one assumes that PNC Bank's acceptance of payments was an unambiguous

promise, McGann cannot show that her reliance on the promise was reasonable given the plain

language in the agreement. Nor can she show that PNC Bank could have foreseen this reliance.

*See, e.g.*, *Nugent* v. *Fed. Home Loan Mortgage Corp.*, No. 2:12-CV-00091, 2013 WL 1326425,

at *6 (E.D. Cal. Mar. 29, 2013) (dismissing plaintiffs' claim that defendants "made a

representation [in the TPP] that if they returned the TPP Agreement executed and with

supporting documentation, and made their TPP payments, they would receive a permanent loan

modification" because plaintiffs' reliance was "neither 'reasonable' nor 'foreseeable'"

(alterations in original)); *see also Marquez*, 2013 WL 98533, at *3 ("Neither Wells Fargo's four

months' response time nor its passive acceptance of plaintiffs' TPP payments subsequent to the

September denial notification renders plaintiffs' belief that a permanent modification was

forthcoming a reasonable one, given their failure to provide the required signatures and

documentation."). Thus, the court finds that summary judgment is appropriate on plaintiff's

promissory estoppel claim.

## II.     Illinois Consumer Fraud Act

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers,

and business persons against fraud, unfair methods of competition, and other unfair and

deceptive business practices." *Robinson* v. *Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960,

201 Ill. 2d 403, 266 Ill. Dec. 879 (2002)). The ICFA is "liberally construed to effectuate its

purpose." *Id.* (citation omitted). The elements of a claim under the ICFA are "(1) a deceptive or

unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the

deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of

conduct involving trade or commerce." *Siegel* v. *Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir.

2010) (citing *Robinson*, 775 N.E.2d at 960). In addition, "a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Id.* at 935 (citation omitted). McGann alleges that PNC Bank engaged in both deceptive and unfair practices. (Sec. Am. Compl. ¶¶ 148–64). Under the ICFA, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober* v. *Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citation omitted). An ICFA claim does not require proof of intent to deceive: a plaintiff need only allege that the defendant committed a deceptive act and intended that the plaintiff rely on that act. *Wigod*, 673 F.3d at 575.

McGann alleges that PNC Bank made false representations that it would grant her a permanent modification. (Sec. Am. Compl. ¶ 149.) Based on those misrepresentations, she chose not to pursue other avenues, including a short sale or refinancing. (*Id.* ¶ 153.) McGann claims that she defaulted on the loan as a result and that this default led to foreclosure. (*Id.*) She argues in response to the motion that PNC Bank knew Evans did not live with her and still encouraged her to apply for a HAMP modification; that the bank later discovered that she was ineligible for a HAMP modification and still did not disclose this to her; that PNC Bank told her to list herself as the co-borrower on the TPP application; that PNC Bank instructed her to sign her own name to the agreement; that PNC Bank never explained that she would have to assume the loan in order to properly apply for a HAMP modification; that PNC Bank agreed to speak with her (as opposed to Evans); that PNC Bank's correspondence was confusing because it was addressed to "homeowner" and she considered herself the homeowner; that PNC Bank frequently sent her warnings that she had not submitted all necessary documents but that when she called they told her that her application was complete; that PNC Bank accepted her TPP payments and later accepted payments in the same amount; that PNC Bank couched the two

forbearance agreements in taking necessary steps to a HAMP modification; and, finally, that

bank employees made numerous statements promising her she would be approved for a

permanent modification, including telling her that her application was up for "re-approval."

(Dkt. 209 at 4–6.)

The last allegation cannot support McGann's claim because, as discussed above, McGann

has not offered any evidence showing that PNC Bank employees promised her she would be

approved for a permanent modification. Some of her other allegations are not actually deceptive:

that PNC Bank's correspondence was confusing because it was addressed to the "homeowner"

and she considered herself the homeowner and that PNC Bank frequently sent her warnings that

she had not submitted all required documents when her application was complete evince nothing

more than a lack of communication. That PNC Bank agreed to speak with her (as opposed to

Evans) is not deceptive, as Evans authorized it as was necessary for PNC Bank to discuss the

loan with her at all. Finally, that PNC Bank knew Evans did not live with McGann and still

encouraged her to apply for a HAMP modification is also not deceptive. Even if Evans did not

live with her, McGann could have been eligible had she become a co-borrower or if she assumed

the loan.

Other allegations, however, could be considered deceptive. For example, McGann alleges

that although PNC Bank knew she was ineligible, it did not disclose this to her, instead

instructing her to list herself as a co-borrower on the application and cross out Evans's name on

the agreement and sign her own. (*Id.* at 5.) This allegation is thinly supported. During her

deposition, McGann explained why she submitted the application with her name on it instead of

Evans's:

> What I did was I called and said: 'Now, it is in Earl's name, but
> I'm the one applying. So should I have him put his financials on

13

> this form [the TPP application]? Because he is not applying, and if he does put his financials on it, we won't qualify. I'm making the mortgage payments. It is based on my income.' I was told just go ahead and submit it. Make sure I mark it up that it is for me, and go ahead and submit it without Earl.

(Dkt. 184-5 at 64:23–65:8.) This testimony does not support her allegation that, with full knowledge that she was ineligible, a PNC Bank employee instructed her to cross out Evans's name and put her own. All it suggests is that an employee, who knew that McGann was applying and Evans was not, told her to make it clear that the application was for her only. The following exchange occurred shortly after:

> Q: [D]o you recall any conversations with anyone at PNC or National City in which you were given any instructions on how to fill out the forms?
>
> A: To the extent of including only my financials.
>
> Q: Do you recall anything else?
>
> A: Not at this time, no.

(*Id.* at 177:17–24.) Later in her deposition, when asked, "[D]id you call up or speak to anyone at PNC or National City about whether you should sign your name to the document or get Earl Evans'[s] signature instead?" McGann replies, "I'm going to say to you that, no, I did not ask them for direction." (*Id*. at 178:23–179:7.) She is then asked, "So even though you didn't receive an authorization to do so, was it your sense that someone at PNC was going to allow you to proceed in your name rather than in Earl's name?" to which McGann replies, "Absolutely, yes." (*Id.* at 180:9–13.)

McGann's version of events changed the second day of her deposition. She was asked, "[D]o you recall actually mentioning that you were not a signer on the note?" She answered, "Yes, that was the whole issue." (*Id.* at 292:17–19.) "And did you, did you mention that during

14

other calls with PNC?" (*Id.* at 292:20–21.)  "Repeatedly."  (*Id.* at 292:22.)  Although this

testimony appears to contradict her earlier testimony, the court is obligated to draw every

justifiable inference in McGann's favor.  *See Anderson*, 477 U.S. at 255.  Thus, the court

assumes that her later testimony represents a more accurate recitation of events.

McGann's testimony, therefore, supports her allegation that although PNC Bank knew

she was ineligible, it never disclosed this to her, instead instructing her to put her name on the

application and the agreement.  It also, somewhat indirectly, supports her allegation that the bank

never explained that she would have to assume the loan in order to properly apply for a HAMP

modification.  Her claim is further bolstered by her assertion that, even after informing a PNC

Bank employee she was not a co-borrower, he told her to submit another HAMP application

(while also putting the loan in forbearance).  (Pl. L.R. 56.1 ¶ 25); (Dkt. 184-5 at 211:18–212:9.)

Possibly, a reasonable jury could find that PNC Bank deceived her (to what end, however, is

unclear since its loss continued to grow throughout the process).

Giving the benefit of the doubt to McGann on that element of proof, however, PNC Bank

has demonstrated the lack of a genuine issue of fact that PNC's conduct was not the proximate

cause of injury to McGann.  As noted above, McGann's claimed injury was defaulting on the

loan and the foreclosure of her home.  McGann acknowledges that she did not qualify for a

HAMP loan modification.  The failure to be more expeditious in communicating that fact to her

did not cause her default and the foreclosure.  Although she speculates that she might have

refinanced, made a short sale, or taken a bankruptcy, she has submitted no evidence that any of

these options would have been feasible.  Had refinancing been an option, McGann would not

have needed a HAMP loan modification.  A bankruptcy would have forfeited the property to the

secured creditor.  A short sale would have resulted in a deficiency judgment against Evans, since

15

he was the borrower on the note.  Although McGann would have been obligated to Evans under the divorce decree, the TTP payments and payments McGann made during forbearance would have reduced that obligation.  Because McGann has no evidence supporting a finding of proximate causation, PNC Bank is entitled to summary judgment.

Finally, the court considers McGann's claim that PNC Bank engaged in unfair practices. For a practice to be unfair, it must "offend public policy; be immoral, unethical, oppressive, or unscrupulous; or cause substantial injury to consumers."  *Rickher* v. *Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (quoting *Robinson*, 775 N.E.2d at 961) (internal quotation marks omitted).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  *Robinson*, 775 N.E. 2d at 961 (citation omitted) (internal quotation marks omitted).  McGann contends that she was denied the HAMP modification (a strange claim to make given that she acknowledges, earlier in her brief, that she did not qualify for the modification and then alleges PNC Bank engaged in deceptive practices by not telling her this); that PNC failed to review her September 2010 HAMP application; that PNC failed to deny her September 2010 application before filing for foreclosure; that PNC failed to consider another alternative instead of foreclosure; that PNC failed to use "reasonable efforts" to "work with" her; and that PNC did not give her enough time to submit documents. (Dkt. 209 at 9–15.)  She also alleges that these actions violated various HAMP procedures and federal guidelines.  (*Id.*)

Since McGann acknowledges that she did not qualify for a HAMP loan modification,  an alleged failure to review her most recent application, to give her sufficient time to submit documents, and to work with her, even if true, could not have caused the foreclosure.  Nor can a denial of a loan modification in accordance with the program's federally-mandated

requirements—requirements that McGann repeatedly acknowledges—be immoral, unethical, oppressive, unscrupulous, or offensive to public policy. The only guidelines McGann alleges were violated separate from PNC Bank's alleged failure to consider her most recent application are the "Freddie Mac Single-Family Seller/Servicer Guidelines." (Dkt. 209 at 14–15.) Not only does McGann fail to provide any authority in support of her claim that these guidelines applied to the loan, she does not explain how this violation caused her injury. (*Id.* at 14 (quoting guidelines).)

Certainly McGann could have benefitted had PNC Bank been more clear, definite, and expeditious in responding to the application, but PNC Bank did not engage in unfair practices under the ICFA. Furthermore, as stated above, she has no facts that demonstrate that the treatment proximately caused the default and foreclosure.

## CONCLUSION

For the reasons set forth above, PNC Bank's motion for summary judgment is granted.

*Joan N Lefkow*

Date:    August 25, 2015            _____
                                                      U.S. District Judge Joan H. Lefkow